**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
MORAVIAN ASSOCIATES, L.P., et al,   :
                                    :
             Plaintiffs,            :   CIVIL ACTION
                                    :
      v.                            :   No. 06-cv-2165
                                    :
THE HENDERSON CORPORATION,          :
                                    :
             Defendant.             :
```

**DECISION**

**Joyner, J.**                                    **August 12, 2008**

This contract-related action was tried without a jury before this Court on February 11, 12, and 13, 2008. The parties have submitted their proposed findings of fact and conclusions of law. Upon consideration of all of the evidence before us, we now make the following:

**FINDINGS OF FACT[1]**

Plaintiffs Moravian Associates, L.P., 121 Walnut Street Associates, L.P., and 121 Walnut Street Restaurant Associates, L.P. ("Plaintiffs," "Moravian" or "Owner") are the developers of

---

[1] We will restrict our enumeration of the findings of fact to only those facts which are relevant to our ultimate conclusions of law.

1

the real estate located at 147 South Second Street and 121-135 Walnut Street in Philadelphia, Pennsylvania ("the Property"). Defendant Henderson Corporation is a Construction Manager with a principal place of business located in Raritan, New Jersey.

In 2003, Plaintiffs began a plan to redevelop and renovate the property, which is where Old Original Bookbinder's Restaurant ("The Restaurant") is located. As part of the plan, Plaintiffs sought to refurbish the Restaurant, which is a historically certified site, and construct new condominiums and apartments behind it. Citizens Bank entered into two construction loan agreements with the Plaintiffs, in the amounts of $8.9 million and $1.9 million, to finance the project. These loans were secured by mortgages on the Property.

Plaintiffs hired Defendant Henderson to serve as the construction manager for the project, and on April 24, 2003, the parties entered into two construction contracts - one for the restaurant renovation and one for the construction of the condominiums and apartments - to memorialize the arrangement. In both contracts, Moravian represented and warranted that it was "financially able to complete the construction of the Project and to fully perform the Construction Contract[s] including, without limitation, its payment obligations, either with its own funds or with the financing provided by the Bank."

2

**Early Work on the Property and the "Interim Agreement"**

Defendant began work on the Project in June, 2003.  Soon after work began, several problems caused delays in the scheduled construction.  In particular, there were unexpected problems with the foundational underpinning of the building and customization requests from prospective buyers which contributed substantially to construction taking longer than anticipated.  The Project was not completed by its original scheduled deadline of July 5, 2004.

In June, 2004, Moravian started to fall behind in its payments to Henderson, largely because it had exhausted the funds obtained for the project from Citizens Bank.  By September, 2004, Henderson had not received payments scheduled for July and August pursuant to the Construction Contracts.  Henderson then informed Moravian that it would cease work on the project unless it received full payment for work performed up to that point.  According to Paragraph 9.7.1 of the Construction Contracts, if it provided seven days notice to Moravian, Henderson had the right to stop work if not paid within seven days after the date established in the Contracts.

On December 3, 2004, Henderson gave notice to Moravian that it would cease work on the project due to non-payment.  Because it had learned that the Citizens Bank funds had been exhausted, Henderson requested financial assurances from the owner.

3

Moravian anticipated paying its remaining debt to Henderson through the sale of condominiums in the building over time. However, the original construction contract did not provide for such a payment arrangement.  Accordingly, the parties began negotiations of an "Interim Agreement" that would allow for payment to Henderson to come from condo sales and for Henderson to return to the work site.

The Interim Agreement was signed on January 27, 2005.  Under this agreement, Moravian assigned to Henderson the proceeds of two condominium sales contingent upon certain conditions, including Citizens Bank's agreement to release the sale proceed funds.  Citizens Bank, which was not a party to the agreement, indicated at this time that it would agree to release the condo sale proceeds if it received a real estate appraisal of the Property and there was a commitment from another financial institution to refinance the Project.  In the Interim Agreement, Moravian explicitly stated that the "owner shall obtain a commitment by February 7, 2005," and that the "Owner has applied for refinancing which will take out Citizens and yield additional available funding for the completion of the project."  However, despite these provisions, Moravian did not secure a commitment from another financial institution.

4

Although Henderson returned to work immediately after the execution of the Interim Agreement, on February 25, 2005, Moravian informed Henderson that it was unable to obtain financing necessary to pay off the obligations to Citizens Bank and that, therefore, it was unable to make further payment to Henderson for the work it had done.  As a result, Henderson informed Moravian that it would cease work on the Project for non-payment if the default was not cured by March 4, 2005. Moravian failed to secure the default by that date, and on March 4, 2005, Henderson ceased work on the Project for non-payment, pursuant to the original Construction Contracts.

**Henderson's Federal Lawsuit and the Settlement Agreement**

On April 13, 2005, Henderson commenced litigation against Moravian in this Court, seeking damages for the Owners' failure to pay Henderson over $3.7 million due under the Construction Contracts.  Immediately after the lawsuit was filed, the parties entered settlement negotiations.  The purpose of the settlement negotiations was to: (1) come to terms by which Henderson could be paid for the work it had performed; (2) to reach an agreement as to what Henderson was owed for the work it had performed; and (3) to entice Henderson to return to the work site to perform the necessary work to complete the Project.

5

On May 1, 2005, the parties reached a settlement agreement in principle, under which Henderson would receive $3.35 million over the next three years.  Henderson agreed to return to work to complete the Project.  As security for the indebtedness, Henderson would receive a mortgage on the Property.  Furthermore, Moravian agreed to secure financing to complete the remaining units.

The specific terms of the Settlement Agreement were finalized over the next few months, with several drafts going back and forth between the parties, and the parties signed the Agreement on September 19, 2005.  The parties agreed, however, that the "effective date" of the Settlement Agreement would be May 1, 2005.  The previous agreements - specifically the Construction Contracts and the Interim Agreement - remained in full force and effect.  Jonathan Sutton, a lead developer of the Project, was a signatory to the agreement and believed the terms of the agreement to accurately reflect the agreement that had been reached between the parties.  Sutton also believed, at the time of signing, that any changes that he or any of Plaintiffs' principals may have wanted to make were already incorporated into the Settlement Agreement at that point.

6

**<u>The Terms of the Settlement Agreement</u>**

By the terms of the Settlement Agreement, the full debt amount of $3.358 million, plus accrued interest, was to be paid to Henderson within three years from the effective date of the Settlement Agreement, or by May 1, 2008.  Interest was to accrue on the indebtedness at a variable rate equal to the Prime Rate plus one percent.  As security for the debt, under Paragraph 3.a. of the Agreement, the Owner agreed to grant Henderson a mortgage on the condominium units junior only to Citizens Bank.  Accordingly, at the time of the execution of the Agreement, Plaintiffs executed and delivered to Henderson a note in the amount of $3.358 million, which contained a "confession of judgment" provision, and a mortgage on the Project's condominium units.  Paragraph 3.b. of the Settlement Agreement further provided that if the fair market value of the remaining available condominium units fell below 120% of the remaining indebtedness to Henderson, plus costs related to completion and sale of the units, plus the amount of any senior liens, then the Owner would provide Henderson additional collateral to raise the total collateral back to the 120% level.

The Settlement Agreement also indicated that the Owner had obtained "revolver" financing in the "maximum aggregate amount of $800,000" from Walnut Street Investment Associates, LLC

7

("revolver lender") to complete the Project and sell condominium units.

The Settlement Agreement also provided for how the proceeds of each condominium unit sale would be distributed.  Under the Agreement, Henderson would not receive any proceeds from condo sales until the debt to Citizens Bank had been fully paid off.  However, after payment of the full amount owed to Citizens and satisfaction of its first mortgage, paragraph 5 provided that the condo sale proceeds would be distributed as follows:

> [F]irst, to pay customary closing costs and expenses chargeable to Owner; second, to the Revolver Lender to finance the completion of the interiors of the unit being sold in accordance with the [attached] schedule of completion costs . . ., but not to exceed $425,000.00 for any one unit and up to a maximum aggregate amount of $800,000.00 for all units; and third, the balance to [Henderson] until such time as the full amount [of indebtedness to Henderson] has been paid in full.

> Paragraph 3.d. of the Settlement Agreement also provided:

> The Parties acknowledge that this Agreement and the Loan Documents may be subject to review by Citizens and [Henderson's] lender ("Lender's Review") and they agree to modify these documents in order to address any concerns raised by the lenders, so long as the proposed modifications do not substantially impair or alter the parties' rights, remedies and obligations under these documents.  The Parties agree to promptly submit this Agreement and the Loan Documents to their respective lenders upon execution of this Agreement and Loan Documents.

8

Paragraph 6 of the Settlement Agreement enumerated "the only remaining obligations" of Henderson.  Specifically, Henderson had to perform: (a) a "Punch List" of specific remaining work which was negotiated and created by representatives of both parties to the Agreement and attached as an Exhibit to the Settlement; (b) submission of all warranties, manuals, and handbooks as required under the Agreements; (c) warranty obligations as required under the Agreements; (d) submission of releases of liens upon final payment as required under the Agreements; and (e) delivery of close-out documents.  Henderson agreed to commence a "good faith and diligent effort to address and repair" particular Punch List items, specifically: (1) water penetration that had occurred at the Project; (2) insulation of ducting; (3) unit owner punch lists; (4) exterior painting; and (5) the canopy.  Henderson also agreed to complete the remaining Punch List items within sixty days of Lender Review of the Settlement Agreement.

Upon execution of the Settlement Agreement, Henderson agreed to terminate its suit against the Owner.

**Events Following the Settlement Agreement**

*Subordination Agreement and Mortgage Recording*

During the negotiation of the Settlement Agreement, Henderson learned that Bookbinder's Restaurant and the Moravian principals held mortgages on the Property.  Although there was initial difficulty in doing so, subordination agreements were

9

eventually signed that enabled the Settlement Agreement to take effect, with Henderson's mortgage on the Property being junior only to Citizens Bank's.

The Settlement Agreement did not make any mention of the mortgage documents being held in escrow, and at the signing of the Settlement Agreement, there were multiple copies of the Agreement executed and everyone present left with in-hand signed documents.  Furthermore, there was no provision in the Settlement Agreement prohibiting or otherwise referencing the recording of the mortgage.  Accordingly, once the subordination agreements were delivered to Henderson's counsel by Moravian, Henderson "closed" the transaction and recorded its mortgage on October 24, 2005.  Citizens Bank was aware on or about November 11, 2005, that Henderson had recorded its mortgage, pursuant to the sale of a condominium unit at the Property.  Even though the recording of the mortgage by Henderson may have constituted an event of default under the loan agreement between Moravian and Citizens Bank, the bank did not demand that Moravian remove the mortgage because settlements continued to occur and the loan was eventually paid off.

**Lender Review and Intercreditor Agreement**

The original loan agreement between Moravian and Citizens Bank included a provision requiring Moravian to get approval from Citizens Bank before further encumbering the Property with another mortgage.  Accordingly, in June, 2005 - during the time that the Settlement Agreement was being negotiated - Moravian and Citizens Bank entered into a Loan Modification Agreement modifying the terms of their original loan agreement.  The loan modification provided that a mortgage would be delivered to Henderson in the amount of $3,550,000 and that the mortgage would have a third priority position behind the Citizens Bank mortgage. The loan modification also set forth four conditions by Citizens Bank for the granting of the mortgage to Henderson, including that "the bank must first review and approve the form of the Henderson mortgage."  Henderson was not, however, provided with a copy of this loan modification agreement.  Furthermore, on an early draft of the Settlement Agreement, counsel for the Owner accepted Henderson's counsel's deletion of language that would make the Settlement Agreement contingent upon Citizens Bank's final approval.

After its execution in September, 2005, Moravian submitted the Settlement Agreement to Citizens Bank.  Coston Cobbs, a Citizens Bank employee who oversaw the loan agreement for the

Project, asked Valentino DiGiorgio, an attorney for Citizens Bank, to prepare the documents necessary to protect the Bank's interests.  This included an Intercreditor Agreement - an Agreement between lenders holding the same collateral - between Henderson and Citizens Bank.  An Intercreditor Agreement was drafted and reviewed by Mr. Cobbs, although he did not compare it against the Settlement Agreement to determine if the two documents were consistent.  Furthermore, Mr. DiGiorgio's stated goal in drafting the Intercreditor Agreement was to be inconsistent with the Settlement Agreement, because Citizens Bank sought to limit the rights of the junior lien holder, i.e. Henderson.

In any event, several drafts of the Intercreditor Agreement were exchanged between Mr. DiGiorgio and Henderson's counsel, Marian Kornilowicz, during the Fall of 2005 in an attempt to reach an acceptable solution.  However, Henderson objected to a number of provisions proposed by Citizens Bank which would have limited their rights under the Settlement Agreement.  In particular, Citizens Bank's proposed Intercreditor Agreement would have: (1) limited Henderson's right to confess judgment; (2) had no restrictions or conditions on Citizens' recording Henderson's mortgage releases which Henderson had to execute in advance and deliver to the Bank; (3) allowed Citizens to take

12

title to any or all of the units in the event of default and wipe out Henderson's mortgage lien; and (4) required Henderson to grant power of attorney to Citizens to act on Henderson' behalf with respect to the mortgage and the Property.  Henderson refused to agree to these terms because it believed its rights under the Settlement Agreement would be impaired, and the Intercreditor Agreement was never executed.

During the negotiation, and after the execution, of the Settlement Agreement, Henderson indicated its willingness to borrow more money to fund the subcontractors' return to the Project in order to complete the remaining Punch List work. During negotiation of the Settlement Agreement, Henderson represented to Moravian that it would be able to secure such financing based on discussions with PNC Bank, which Henderson had approached to secure financing in the amount of $2.2 million to pay the returning subcontractors.  In late 2005 or early 2006, PNC Bank informed Henderson that it would only loan the company up to $1 million because the collateral (i.e. Henderson's note and mortgage on the Property) was "thin."  To close on this loan, PNC required an estoppel certificate to be executed by Moravian. Moravian objected to the content of the estoppel certificate, however, because it believed the company would be exposed to liability for claims by PNC Bank arising from the Estoppel

13

Certificate.  Thus, Joel Luber, one of Moravian's attorneys, offered that Moravian would sign the estoppel certificate if Henderson would indemnify Moravian for any claims by PNC arising from the estoppel certificate.  Henderson rejected this offer, and the estoppel certificate was never signed or executed.

**Punch List Work**

*"Super-priority" Punch List Items*

  Exhibit C to the Settlement Agreement contained the Punch List of items which Henderson agreed to return to the work site to complete.  After the Settlement Agreement was executed in September, 2005, Henderson returned, along with a number of its subcontractors, to the Project site to begin the Punch List work. Henderson then began investigating and making repairs to the first item on the "super-priority" Punch List, as listed in Paragraph 6(a) of the Settlement Agreement:  the water penetration problem in the building.  Moravian hired the firm of Thornton-Tomasetti to investigate water leaks at the Project and, as a result, Thornton-Tomasetti produced a report on October 28, 2005, making recommendations for addressing the problems. Henderson performed those recommendations, and the leaks were resolved at that time.  Despite Henderson's performance of the independent recommendations, however, additional leaks

subsequently appeared.  Mr. Sutton at Moravian believed that a cap should be installed above balcony doors to address the problem.  However, this feature was not part of the original Project design, and Mr. Sutton acknowledged that the leaks over balcony doors may have occurred due to design flaws; he did not know, though, to what extent other leaks were occurring due to the design of the Project.  Any issues that were design related would not, under the Agreements, be Henderson's responsibility. In any event, water infiltration issues continued to occur despite Henderson's efforts to address the problem, and Moravian continued to receive complaints about leaks.

Henderson also addressed, and performed work on, the HVAC duct insulation issues, exterior painting, and canopy issues listed in Paragraph 6(a).

*Other Punch List Items Performed by Moravian*

Henderson also returned to the work site with its own people to perform the remaining Punch List items.  Many - though not all - of the original subcontractors also returned to complete Punch List items.  A variety of items on the Exhibit C Punch List, however, ended up being performed by Moravian - either by its own maintenance staff or other outside contractors - rather than Henderson.  Some of these items were due to Henderson failing to

15

do the work at all, or failing to do it to Moravian's liking,
while others were due to the failure of subcontractors to return
to the work site or do the work properly.  Moravian compiled a
list of back charges, which it submitted at trial, reflecting the
cost to Moravian of self-performing certain Punch List items.
Moravian calculated the total amount of these charges to be
$209,474.00.  Some of this amount also reflects reimbursement for
the time spent by the in-house maintenance workers at the
building, though the bulk of it - $202,274.00 - stems from
invoices from the outside contractors brought in to complete some
work.

Under the Settlement Agreement, if Henderson failed to
perform any of the items listed in Paragraph 6 of the Agreement,
Moravian was entitled to exercise its rights under the
Construction Contracts, which included self-performing the work
or having someone else perform the work and then back-charging
Henderson accordingly.  The Construction Contracts provided,
however, that Moravian had to give seven days notice to Henderson
and an opportunity to cure before resorting to self-performance
or hiring outside contractors.  Specifically, Paragraph 2.4.1 of
the Construction Contracts provided:

> If the contractor defaults or neglects to carry out the
> work in accordance with the contract documents and
> fails within a seven-day period after receipt of

written notice from the owner to commence and continue
correction of such default or neglect with diligence
and promptness, the owner may, without prejudice to
other remedies the owner may have, correct such
deficiencies.

Although the Punch List items on Moravian's list of back charges
were indeed Henderson's responsibility under the Agreements,
Henderson never received any written notice that Moravian was
going to perform Punch List items on its own.  Rather, Henderson
was informed of many completed items *after* they had already been
self-performed.  The only notices provided to Henderson regarding
unresolved Punch List issues between March of 2005 and September
of 2006 were regarding the water infiltration problem.

*Ongoing Condominium Sales and Collateral Shortfall*

As noted above, under the Settlement Agreement, the Owner
was required to post additional collateral as security for the
debt owed to Henderson in the event that the fair market value of
the condominiums fell below 120% of the remaining indebtedness,
plus estimated closing costs, estimated costs to complete the
remaining units, and the payoff of any liens on the Property
senior to Henderson.  In May, 2006, Henderson made demands of
Moravian to post additional collateral because they believed
units were not selling as fast as expected and the costs to

17

complete the Project had increased, and calculated the collateral shortfall at that time to be over $1.5 million.  Henderson also tendered appraisals to Moravian to support its contention that the fair market value was insufficient under the Settlement Agreement.  For its part, Moravian did not secure an independent appraisal of the Property to refute Henderson's contention about the Settlement Agreement, relying instead on its own subjective estimate of the Property value.  Moravian did, however, engage in conversations with Henderson regarding the posting of additional collateral and creative means to address the collateral shortfall.  However, none of the discussed measures came to fruition, and on March 26, 2007, Henderson confessed judgment on the mortgage Note due to the collateral shortfall.

Out of the eight condominium units that were unsold at the time of the execution of the Settlement Agreement, five have since been sold for a gross total of $5.53 million.  Henderson did not receive any of the proceeds from those five unit sales. The value of the three remaining condo units is approximately $3 million.  As of May 1, 2008, the value of the indebtedness to Henderson, including accrued interest, is $4,355,207.00.  Thus, the value of the collateral is well less than 120% of the remaining indebtedness to Henderson.

18

*State Court Petition*

On April 26, 2007, Plaintiffs filed a Petition to Open Confession of Judgment in the Court of Common Pleas of Philadelphia, arguing that lender approval was a condition precedent to the Settlement Agreement.  Henderson filed a responsive pleading, denying Plaintiffs' allegations and arguing that lender approval was not a condition precedent to the Settlement Agreement.  In an Order dated June 19, 2007, the Court of Common Pleas denied Plaintiffs' Petition.  Plaintiffs have appealed this decision, and it appears that the appeal remains pending.

## **Procedural History**

On May 15, 2006, Plaintiffs filed their Complaint for Emergency Equitable Relief and to Quiet Title to Real Estate in the Pennsylvania Court of Common Pleas, Philadelphia County, primarily seeking a declaratory judgment stating that the Settlement Agreement was a nullity because it was not approved by the parties' lenders, and thus Henderson's mortgage should be stricken from the land records.  In the alternative, Plaintiffs requested a declaration by the Court that (a) Walnut Street Investment Associates, LLC is entitled to reimbursement of all monies loaned to Moravian, not simply to a cap of $800,000; (b)

Henderson is not entitled to additional collateral; (c) Henderson is not entitled to charge Moravian interest during a period of alleged default due to failure to perform punch list work; and (d) Moravian is entitled to a credit for punch list work performed and to perform punch list work itself.[2]  Henderson removed the matter to this Court, and filed its Answer on August 10, 2007.  Claiming that Plaintiffs breached the Settlement Agreement for failing to provide additional collateral, Henderson also filed a counterclaim for attorney's fees incurred as a result of defending this action.


## DISCUSSION

### I.  Lender Approval

The threshold issue in this case is whether the Settlement Agreement required approval from both parties' lenders in order to take effect.  This issue essentially comes down to the parties' disagreement over the meaning of Paragraph 3.d of the Agreement, which provides:

> The Parties acknowledge that this Agreement and the
> Loan Documents may be subject to review by Citizens and

---

[2] In Count II of their Complaint, Plaintiffs also requested injunctive relief to release escrowed proceeds from the sale of condominium unit 204. However, Henderson subsequently agreed to release those proceeds, and thus Count II has been rendered moot.

> [Henderson's] lender ("Lender's Review") and they agree
> to modify these documents in order to address any
> concerns raised by the lenders, so long as the proposed
> modifications do not substantially impair or alter the
> parties' rights, remedies and obligations under these
> documents.  The Parties agree to promptly submit this
> Agreement and the Loan Documents to their respective
> lenders upon execution of this Agreement and Loan
> Documents.

Plaintiffs argue that this paragraph constitutes an "express
condition" such that the Agreement would not be in effect unless
and until the banks approved the terms of the parties' respective
loan documents and the Settlement Agreement itself.  Defendant
primarily contends that the use of the word "may" in referring to
lender review indicates that the parties did not intend for
lender approval to be a precondition to the Agreement taking
effect.  Accordingly, we must determine whether Paragraph 3.d
should be interpreted as requiring lender review before the
Settlement Agreement could take effect.

The Third Circuit has held that under Pennsylvania law:

> [c]ontract interpretation is a question of law that
> requires the court to ascertain and give effect to the
> intent of the contracting parties, as embodied in the
> written agreement.  Courts assume that a contract's
> language is chosen carefully and that the parties are
> mindful of the meaning of the language used.  When a
> writing is clear and unequivocal, its meaning must be
> determined by its contents alone.

Schwab v. PennSummit Tubular, LLC, 523 F.3d 134, 137 (3d Cir.
2008) (citing Dep't of Transp. v. Pa. Indus. for the Blind &

<u>Handicapped</u>, 886 A.2d 706, 711 (Pa. Commw. Ct. 2005)).  Although Pennsylvania law presumes that the writing conveys the intent of the parties, courts may use extrinsic evidence, such as the parties' course of conduct in drafting the agreement, to determine whether an ambiguity exists.  <u>See</u> <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 614 (3d Cir. 1995); <u>Prudential Ins. Co. of Am. v. Prusky</u>, 413 F. Supp. 2d 489, 494 (E.D. Pa. 2005).  However, the Third Circuit has cautioned that a contract will be found ambiguous "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning."  <u>Duquesne</u>, 66 F.3d at 614 (citing <u>Samuel Rappaport Family Partnership v. Meridian Bank</u>, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995)).

Employing these contract law principles, we find that the language of Paragraph 3.d of the Settlement Agreement is clear and unequivocal, and does not require lender approval before it is to take effect.  As an initial matter, we note that the word "may" in the phrase "may be subject to review by Citizens and [Henderson's] lender" is commonly understood, particularly in the legal profession, to imply permissive, rather than mandatory, conduct, and we can find nothing in the surrounding context to

change that meaning.  See Gingras v. Gen. Elec., 476 F. Supp.
644, 646 (E.D. Pa. 1979) ("The word 'may' . . . is always used in
the permissive sense unless context makes necessary a mandatory
effect.").  Furthermore, the word "approval," or some synonym
thereof, does not appear anywhere in Paragraph 3.d, least of all
in reference to the lenders' review of the Agreement.  This
absence, combined with the fact that the Agreement was expressly
not to be submitted to the lenders until *after* its execution,
strongly implies that it was not understood to be a condition
precedent to the Agreement taking effect.  Instead, the language
makes clear that the parties would attempt to address any lender
concerns, but only to the extent that their own rights under the
Agreement were not impaired.  If lender approval were required
*before* the document took effect, then the "rights" of the parties
could not be a limitation on lender review because they would not
have yet vested.  This context also suggests that lender review
and approval were not required.  In sum, we find that the clear
language of the Settlement Agreement did not require lender
approval before the Agreement could take effect.[3]  Thus, we
accordingly also find that the Settlement Agreement did in fact

_____

   [3] The parties extensively briefed the issue of whether we must defer to
the ruling of the Pennsylvania Court of Common Pleas that Settlement Agreement
did not require lender review.  Because we agree with that Court's decision,
we need not discuss whether res judicata, collateral estoppel, or the *Rooker-
Feldman* doctrine apply here.

take effect upon its execution, with an effective date of May 1, 2005.

Furthermore, we find that in terms of required performance under the Settlement Agreement, Henderson fulfilled its obligation under Paragraph 3.d to address the concerns of Citizens Bank.  Henderson engaged in good faith negotiations with Citizens over the drafting of an intercreditor agreement which would have satisfied Citizens' concerns about the encumbrance on the Property.  However, it did not sign any agreement with Citizens because Citizens insisted on including terms that would have impaired Henderson's rights as a holder of a mortgage on the Property.  This was within the clear limitation on lender review found in Paragraph 3.d.


## II.  Cap on Revolver Reimbursement

Given that the Settlement Agreement is effective as of May 1, 2005, we must next determine whether, under the terms of the Agreement, Walnut Street Investment Associates (WSIA) is only entitled to reimbursement up to a cap of $800,000.00 before Henderson's rights to unit sale proceeds vest.  This dispute stems from Paragraph 5.a. of the Settlement Agreement, which provides that once the Citizens debt is fully paid off, the

24

proceeds from subsequent condo unit sales are to be distributed as follows:

> [F]irst, to pay customary closing costs and expenses chargeable to Owner; second, to the Revolver Lender to finance the completion of the interiors of the unit being sold in accordance with the schedule of completion costs, attached [to the Agreement as] Exhibit B, but not to exceed $425,000.00 for any one unit and up to a maximum aggregate amount of $800,000.00 for all units; and third, the balance to [Henderson] until such time as the full amount [of indebtedness to Henderson] has been paid in full.

Plaintiffs argue that because the completion of the unit interiors on the whole was budgeted at around $1.5 million, the "maximum aggregate amount" was to be $800,000 "at any one time." Essentially, Plaintiffs argue that with the sale of each unit, WSIA could receive up to $800,000, regardless of how much they received from previous unit sales, before Henderson was to receive any of the sale proceeds. Thus, Plaintiffs stress that the phrase "up to a maximum aggregate of $800,000.00 for all units should be interpreted as meaning "up to an aggregate of $800,000 *at any one time*." Defendant, for its part, contends that the $800,000 amount was a hard cap to be applied to all unit sales, such that as soon as WSIA received $800,000 from unit sales generally, its rights to payment would vest.

Considering the evidence before us, we agree with Defendant that the language in paragraph 5.a. is clear and unambiguous, and

25

that the phrase "at any one time" should not be implied into the
Agreement.  That is to say, we find that under the Settlement
Agreement, WSIA is only entitled to reimbursement of monies up to
a total aggregate of $800,000.00 for all units before Henderson's
interest in the sales' proceeds vests.  Our finding is based
largely on the presumption under Pennsylvania law that the
writing itself conveys the intent of the parties.  If the parties
had truly intended for the $800,000 cap to apply only at "any one
time," or for the aggregate cap to actually be the budgeted $1.5
million, they could have put that language in the Agreement; the
absence of that language, however, strongly suggests that it was
not meant to be part of the Agreement.  Instead, the language of
Paragraph 5.a. is plain, and the phrase "maximum aggregate of
$800,000 for all units" is clear and unambiguous.

Furthermore, we note that Plaintiffs' proposed
interpretation would make Paragraph 5.a. somewhat internally
inconsistent.  That provision states that the proceeds from each
sale are to go, "second," to the Revolver Lender "to finance the
completion of the interiors of *the unit being sold*."  If
Paragraph 5.a. were interpreted to mean that WSIA was entitled to
up to $800,000 separately upon each unit sale, then WSIA could
receive proceeds from a sale to finance the completion of *other*
units, since the proceeds for an individual unit are clearly

capped at $425,000.  In other words, using Plaintiffs' proposed reading, Paragraph 5.a. would state that WSIA shall be reimbursed for the completion of "the unit being sold," but then may also receive proceeds for other "units already sold" or "unsold units."  We refuse to read the contract language in a way that would create such an inconsistency.  Accordingly, we find that the $800,000 cap applies to all unit sales in the aggregate, such that Defendant's right to sale proceeds vests once WSIA has received a total of $800,000 for all unit sales.

## III.  Punch List Work

Plaintiffs next request that their debt to Defendant be reduced by $209,474.00 to reflect the amount of Punch List work that Plaintiffs either self-performed or paid a third party to perform.  Defendant contends that they were not given sufficient notice before self-performance by the Owner occurred, and thus it cannot be back-charged for those Punch List items.  Paragraph 2.4.1 of the General Conditions to the original Construction Contract between the parties provides:

> If the Contractor defaults or neglects to carry out the work in accordance with the contract documents and fails within a seven-day period after receipt of written notice from the owner to commence and continue correction of such default or neglect with diligence and promptness, the owner may, without prejudice to

27

Case 2:06-cv-02165-JCJ   Document 47   Filed 08/14/08   Page 28 of 39

other remedies the owner may have, correct such
deficiencies.

The Contract goes on to state that the owner may then back-charge
the Contractor for the cost of self-performance.  Plaintiffs
argue that this provision only applies to the self-performance of
work during the course of construction, not self-performance of
punch list items after "substantial completion."  We disagree
with Plaintiffs' reading of this part of the Construction
Contract, and find that the notice requirement remained in effect
even after "substantial completion" was certified as to the
Project here.  The plain language of Paragraph 2.4.1 does not
limit the notice requirement to the time before "substantial
completion."  The only evidence Plaintiffs offered to support
their theory was cherry-picked testimony from Henderson's Project
Manager, Matthew McNeill.  However, Mr. McNeill actually stated
quite clearly that he disagreed with Plaintiffs' reading of the
notice requirement, and that the "substantial completion" clauses
actually dealt with work that was incomplete at the time of
*occupancy*, not the time at which the "substantial completion"
certificate issued.  Tr. 12/13/2008 at 133.  We therefore reject
Plaintiff's interpretation that Paragraph 2.4.1 applied only to
the time before "substantial completion" of the Project.

28

Plaintiffs next argue that notice was not required under Section 14.2.2 of the Construction Contract, which allowed the owner to finish work by "whatever reasonable method the owner may deem expedient."  This Section, however, expressly applied only to "What Happens After Termination by the Owner for Cause."  We find that such a termination for cause did not occur in this case, especially when it was actually the *contractor* who walked off the job due to non-payment.  Thus, this provision also did not affect the Contract's notice requirement, and accordingly, we find that under the Construction Contracts, the notice requirement remained in effect at the time the Punch List work was being performed.

Given that the notice requirement remained in effect after substantial completion, we must determine whether Henderson was provided with sufficient notice before Moravian's self-performance of certain Punch List items.  We find that Plaintiffs have not satisfied their burden of showing that sufficient notice was provided about specific Punch List items that were eventually self-performed.  The only evidence provided by Plaintiffs on this point is a letter from Christopher Lee, counsel for Moravian, to Marian Kornilowicz, counsel for Henderson, dated February 20,

2006.[4]  That letter acknowledges Henderson's difficulty to obtain
financing without having recorded its junior mortgage on the
Property, and then informed Mr. Kornilowicz that Moravian would
not sign the Estoppel Certificate - which PNC Bank had required
before providing further sub-contractor financing to Henderson -
until the Intercreditor Agreement between Henderson and Citizens
was completed.  The letter then states that if the remaining
Punch List work at that time is not completed by March 15, 2006,
Moravian "will have no choice but to perform the work itself and
back-charge Henderson for the cost."

     We do not deem this letter to be sufficient notice under the
Construction Contracts.  First, it does not point to any specific
items as requiring attention, and we find it to act more as an
expression of Moravian's enthusiasm for the work being completed
by March 15th.  Second, one of the Punch Lists (P. Ex. 28)
produced by Plaintiffs as evidence that work was self-performed
was apparently updated on February 21, 2006 - just *one day* after
Mr. Lee's letter was sent - and this list indicates that much
work had already been self-performed by Moravian at that time.

---

     [4]  As Defendant acknowledges, the record contains evidence of several
notices from Moravian about the ongoing water infiltration problem.  However,
the record shows that Defendant continued to address the concerns raised,
attempting many solutions to correct the problem.  In any event, the water
infiltration problem does not appear to be considered by either party to be
part of the Punch List credits issue.  Thus, we do not consider those notices
of specific water leak problems to be evidence of notice of other Punch List
deficiencies.

Furthermore, Edward McMahon, an owner of the Henderson Corporation, and Mr. McNeill testified that they never received oral or written notice about Moravian's specific intention to perform any Punch List items.  In fact, Mr. McNeill testified that the first time he learned about many of the items in question was when he would view the items already self-performed during periodic walkthroughs with building representatives.  We view these factors as weighing in favor of the view that Mr. Lee's February 20, 2006 letter was not intended to be notice within the meaning of Paragraph 2.4.1.  Accordingly, because sufficient notice was not provided, Plaintiffs are not entitled to any reduction in their debt to Defendant based on Punch List back-charges.

## IV.  Additional Collateral

In its counterclaims, Henderson asserts that Moravian breached the Settlement Agreement by failing to provide collateral valued at no less than 120% of the indebtedness to Henderson.  To support this claim, Henderson provided evidence showing that as of April, 2006, there was a collateral shortfall of over $1.5 million based on the estimated value of the remaining unsold condominium units.  Plaintiffs have not disputed Henderson's calculations or argued that the value of the units

was actually greater than 120% of its indebtedness to Henderson.[5]
Accordingly, we find that unless it provides additional
collateral, Moravian is in breach of the Settlement Agreement for
failure to maintain a collateral-to-debt ratio of more than 120%.

## V.  Accrual of Interest

Plaintiffs also seek a declaration that once Henderson
failed to complete Punch List items, as it had to do under the
Settlement Agreement, interest stopped accruing on the debt.  We
cannot provide the relief Plaintiff seeks.  As an initial matter,
we find that Plaintiffs have not met their burden of proving that
Henderson was in default under the terms of the Agreement.
However, we furthermore find that the tolling of interest accrual
was not a remedy contemplated or authorized by the Settlement
Agreement.  The only reference to interest in the Agreement is in
Paragraph 2, which simply states:

> The indebtedness shall accrue interest from May 1, 2005
> at a variable rate equal to the Prime Rate published in
> the "Money Rates" section of *The Wall Street Journal*,
> as it may change from time to time, plus one (1%)
> percent.  The full amount of the indebtedness, plus

---

[5]  Plaintiffs only baldly state that this issue is moot because
"Henderson already has a lien in the form of a mortgage or a confessed
judgment on all [of] Moravian's property."  However, there is no evidence
showing the value of that property and its ratio to the outstanding debt, and
Henderson did not address the argument in its proposed findings.  Thus, we
cannot agree with Plaintiffs that the issue is moot while we are faced with
evidence from Henderson that the collateral falls well short of the 120%
level.

>       accrued interest, shall be paid in full within three
>       (3) years from the date of this Agreement.

This provision, by its clear and unambiguous terms, did not

condition accrual of interest on performance of the Punch List

items or provide that interest could be withheld if those items

were not completed.  Instead, Paragraph 6 provided that "[i]f

Construct Manager fails to repair, Owner may elect to exercise

any and all remedies under the Agreements and this Agreement."

Plaintiffs have pointed to no provision in the Construction

Contracts or Settlement Agreement that lists withholding of

interest as a remedy for failure to make Punch List repairs.

Accordingly, we find that interest accrued on the outstanding

debt throughout the period in question.  Thus, we also find that

as of May 1, 2008 (the deadline in the Agreement for payment of

the debt), the value of the indebtedness to Henderson, including

accrued interest, is $4,355,207.00.


## VI.  Attorney's Fees under CASPA

Finally, Henderson seeks $158,879.00 in attorney's fees for

its work in defending this matter under the Pennsylvania

Contractor and Subcontractor Payment Act (CASPA), 73 Pa. Cons.

Stat. § 501 *et seq.*  "The underlying purpose of [CASPA] is to

protect contractors and subcontractors . . . [and] to encourage

fair dealing among parties to a construction contract."
Ruthrauff, Inc. v. Ravin, Inc., 914 A.2d 880, 890 (Pa. Super. Ct.
2006).  In addressing the owner's payment obligations, CASPA
specifically provides that "[t]he owner shall pay the contractor
strictly in accordance with terms of the construction contract."
73 Pa. Cons. Stat. § 505(a).  Furthermore, CASPA provides that,
"[n]otwithstanding any agreement to the contrary, the
substantially prevailing party in any proceeding to recover any
payment under this act shall be awarded a reasonable attorney fee
in an amount to be determined by the court or arbitrator,
together with expenses."  73 Pa. Cons. Stat. § 512(b).  Despite
the mandatory language of section 512(b) requiring a fee award to
a "substantially prevailing" party, "the issue of whether any
party to a lawsuit substantially prevailed is left to the trial
court's discretion."  Zavatchen v. RHF Holdings, Inc., 907 A.2d
607, 610 (Pa. Super. Ct. 2006).

        In Zavatchen v. RHF Holdings, Inc., 907 A.2d at 610-11, the
Pennsylvania Superior Court recently held that a defendant, if
determined to be a substantially prevailing party, can receive
attorney fees under section 512(b).  Though the Court did not
adopt a particular method for determining whether a defendant is
a "substantially prevailing party," it did note that in a similar

context of suits involving employment contracts, the Pennsylvania

Superior Court explained:

> A 'prevailing party' is commonly defined as 'a party in
> whose favor a judgment is rendered, regardless of the
> amount of damages awarded.'  While this definition
> encompasses those situations where a party receives
> less relief than was sought or even nominal relief, its
> application is still limited to those circumstances
> where the fact finder declares a winner and the court
> enters judgment in that party's favor.

Id. at 610 (citing Profit Wize Mktg. v. Wiest, 812 A.2d 1270,

1275-76 (Pa. Super. Ct. 2002)).  Plaintiffs here have sought

declaratory judgments as to: (1) their obligation to pay their

debt to Defendant under the terms of the Settlement Agreement,

which modified the original Construction Contracts; (2) a

reduction in the amount of interest owed on the debt; and (3)

alternatively, a reduction in the debt by the amount of self-

performed repairs.  With this Decision, we are awarding judgment

to Defendant on all three of those claims.  The only ostensible

purpose of this litigation is for Plaintiffs to attempt to avoid

their payment obligations under the Settlement Agreement - which,

we note, was itself a product of Moravian's failure to make

timely payments to Henderson in the first place.  Thus,

Henderson's defense in this action was necessary to secure its

rights to the payment that was owed to it under the Construction

Contracts.  We find such a successful defense to be within the

35

purposes of CAPSA, and we find that Henderson is a "substantially prevailing party" within the meaning of section 512(b).

But although we find that Henderson is entitled to attorney fees, we cannot make an award at this time.  As an initial matter, we note that CAPSA attorney fees are ordinarily handled at the post-trial stage, separately from the Court's decision regarding liability and damages.  See Zavatchen, 907 A.2d at 609 (noting appeal stems from Motion for Post-Trial Relief); LBL Skysystems, Inc. v. APG-America, Inc., 514 F. Supp. 2d 704, 708-09 (E.D. Pa. 2007) (deciding Motion for Attorney's Fees filed *after* judgment entered in Plaintiff's favor).  More importantly, though, the attorneys' work summary provided by Henderson does not provide us with enough information to determine a "reasonable" fee award.  In addition to the work summary already provided, we require, at the very least: (1) the full name of each attorney who worked on each discrete task (rather than just initials, as are on the current time summary); (2) the qualifications and experience of each of those attorneys; and (3) an explanation of how the hourly rates used in the Defendant's calculations were chosen.  In other words, we need sufficient information to determine the reasonableness of the hourly rate and the number of hours expended in defending the litigation.  We will also consider any other relevant information from Plaintiffs

36

that may bear on the question of whether the rate or number of hours should be reduced for some reason.  In the Order accompanying this Decision, we will grant both parties the opportunity to properly brief the issue of attorney fees and to provide the necessary information.

## CONCLUSION

We find in favor of Defendant in all respects, and will enter judgment in favor of The Henderson Corporation.[6]  We find that approval by the parties' respective lenders was not required for the Settlement Agreement to take effect, and that therefore the Settlement Agreement did take effect with an effective date of May 1, 2005.  We further find that Defendant was not given sufficient notice before self-performance of Punch List items, and thus Moravian is not entitled to a reduction in debt by the value of self-performed repairs under the terms of the Construction Contracts.  We also find that under the Settlement Agreement, Defendant's right to condominium sale proceeds takes effect when the Revolver Lender is paid $800,000.00 in total across all unit sales, and not "at any one time."  Finally, we find that Defendant is a "substantially prevailing party" for

---

[6]  To be perfectly clear, we are making no ruling as to Count II of Plaintiffs' Complaint, which the parties have informed us is now moot due to Henderson's release of the Unit 204 mortgage.

purposes of CAPSA, but we cannot make an exact fee award at this time.

An Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
MORAVIAN ASSOCIATES, L.P., et al,   :
                                    :
            Plaintiffs,             :   CIVIL ACTION
                                    :
      v.                            :   No. 06-cv-2165
                                    :
THE HENDERSON CORPORATION,          :
                                    :
            Defendant.              :
```

<u>ORDER</u>

AND NOW, this  12th  day of August, 2008, following Non-Jury Trial in this matter on February 11, 12, and 13, 2008, and for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law above, it is hereby ORDERED that:

1.  Judgment is ENTERED in favor of Defendant The Henderson Corporation.  Plaintiffs' request for the Settlement Agreement to be declared a nullity, or in the alternative for off-sets in the amount of indebtedness to Defendant Henderson Corporation is DENIED.


2.  Defendant Henderson Corporation shall have ten (10) days from the date of this Order to file a post-trial Motion for Attorney's Fees with the information requested in the accompanying Memorandum.  Plaintiffs shall have ten (10) days after the filing of any Motion for Attorney's Fees to file a response brief.


                                    BY THE COURT:



                                    s/J. Curtis Joyner
                                    J. CURTIS JOYNER, J.